

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Building*
*26 Federal Plaza*
*New York, New York 10278*

January 2, 2026

**BY ECF**

The Honorable Margaret M. Garnett
United States District Judge
Southern District of New York
New York, New York 10007

Re:    <u>United States</u> v. <u>Brent Cranmer</u>, 25 Cr. 212 (MMG)

Dear Judge Garnett:

        In connection with the sentencing of Brent Cranmer, the Government respectfully submits this letter, pursuant to Section 5K1.1 of the United States Sentencing Guidelines, to advise the Court that Cranmer has provided substantial assistance to the Government. Cranmer's cooperation was indispensable to the Government's ability to charge his two, money-making coconspirators (Jonathan Whitesides and Daniel McCormick) and to secure from them swift pre-indictment guilty pleas, resulting in more than $1.2 million of fines and forfeiture for the United States. Accordingly, the Government respectfully moves the Court to sentence the defendant in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

<u>**Cranmer's History and Background**</u>[1]

        Cranmer is 52 years old. He was born in Mountain View, California and moved to Southern California as a teenager. Cranmer had six siblings including four sisters and two brothers. He went to college at Brigham Young University and earned a BA/MA in accounting.

        Cranmer moved back to Los Angeles in 2002 after graduating and worked for PwC for about a year. He then moved back to Utah with his wife, Keri Cranmer. Cranmer has three sons, who are between 11 and 18 years old. Keri has been a stay-at-home mother for the Cranmers' entire married life. Keri also had a son named Porter from a previous marriage. Porter had muscular dystrophy and required significant medical care. In 2024, Porter graduated from college at age 26 and was the first college graduate on Cranmer's wife's side of the family. In September 2024, Porter was visiting his biological father's home and had a pulmonary embolism and passed away.

        Cranmer worked for various companies in Utah. He worked for Geneva Pipe, then for Cow House Partners (an oil and gas company), then for Rocky Mountain Materials (a concrete company), and then for Blue Sky. In 2009, Blue Sky made Cranmer an offer to move to California,

---

[1] Cranmer provided the information in this section during a proffer session with the Government in February 2025.

which he accepted. Cranmer later worked for Tee Fury, which was a direct-to-consumer tee shirt company. Cranmer was brought in as the CFO/COO to help bring structure to the business so they could sell it. Cranmer ran the company for nine months and then was recruited to Bal Seal in October 2015.

Cranmer was the director of finance operations at Bal Seal when he started and reported to the Chief Financial Officer (CFO). In late 2018 or early 2019, the CFO left and Cranmer took over the CFO role. The owner's wish was that when he passed away he would sell the business. In 2020, they sold Bal Seal to Kaman and became a wholly owned subsidiary. In May 2022, Cranmer was promoted to Vice President and General Manager of Bal Seal. He had about 600 employees.

Other than the instant offense, Cranmer has no other criminal history and has reported no other criminal conduct.

Cranmer has been friends with Jonathan Whitesides and his family for over a decade. The friendship started with their wives, and Whitesides and Cranmer first met at church. Whitesides and Cranmer had dinners together and, about five years ago, climbed Mount Whitney together. In 2023, there were times that Cranmer would see Whitesides every week, and there were times where it would be multiple weeks. Whitesides liked to do drop-ins at Cranmer's house. They also saw each other in church.

Cranmer never met or spoke to Daniel McCormick.

## Offense Conduct

In December 2023, Cranmer told his longtime friend, Jonathan Whitesides, that Cranmer's company, Kaman, was about to be acquired. (PSR ¶ 13). Whitesides and Cranmer then together launched a scheme to reap illegal profits by misappropriating and trading on this material nonpublic information, in violation of duties of trust and confidence owed to the company and its shareholders. (PSR ¶ 12).

The day after Cranmer confirmed to Whitesides that Kaman was in merger discussions, Whitesides had his wife open a new Fidelity brokerage account under her name. (PSR ¶ 16). He then began transferring money into that account and using almost all of his liquid assets to accumulate a large position in Kaman short-term call options. (PSR ¶¶ 19-23, 27). These purchases took place on multiple days over the course of weeks. *Id.* At times, Whitesides also called his brokerage firm's customer support lines, pressing for information about the mechanics of taking the gains once the option price was triggered. (PSR ¶ 21). Whitesides and Cranmer communicated on an almost daily basis throughout this period so that Whitesides could receive updates on the deal's progress. (PSR ¶ 22).

Whitesides not only misused material nonpublic information for his own purposes, but also enlisted others in his scheme so that they could trade on the information as well. Whitesides recruited his friend Daniel McCormick into the scheme, in part because McCormick had more experience trading securities. (PSR ¶¶ 17-18). In response to a request from Cranmer, Whitesides tried to convince McCormick to trade on Cranmer's behalf so that Cranmer could profit from the

information without leaving an obvious trail in the financial records. *Id.* McCormick at first agreed, but then decided it was too risky, and instead decided to trade on the information for himself. Cranmer and McCormick never met or even spoke—instead, throughout the scheme, Whitesides acted as the middleman, trying to convince McCormick to trade for Cranmer, and then funneling Cranmer's information to McCormick. (PSR ¶¶ 18, 22, 25). For example, on December 29, 2023, Whitesides texted McCormick, "I am waiting for confirmation on the anticipated 'announcement date' to alleviate risks on the timeline strike price." (PSR ¶ 22). And when McCormick declined to purchase options on Cranmer's behalf, Whitesides assured Cranmer he found another person—Whitesides's business partner—whom Whitesides believed he could convince to make the trades. (PSR ¶ 26). Whitesides helped that person set up a brokerage account to make the trades, but by the time the account received the requisite approvals, the Kaman acquisition had been publicly announced and it was too late. *Id.*

When the deal was announced, Whitesides made $922,635 from his insider trading and McCormick made $115,596. (PSR ¶¶ 33, 34).

In May 2024, the Financial Industry Regulatory Authority ("FINRA") sent an identification letter to Kaman, which included both Whitesides's name and McCormick's name. (PSR ¶ 35). Cranmer saw the names on the list and told Whitesides. Whitesides told Cranmer to lie and say that that he did not know Whitesides, but Cranmer told Whitesides that they had known each other for too long and he could not say that. Whitesides then told Cranmer that he was going to delete the text messages between the two of them. *Id.* Whitesides did, in fact, delete those messages. Cranmer did not delete the messages from his phone.

On February 6, 2025, the FBI attempted simultaneous approaches and interviews of Cranmer, Whitesides, and McCormick. During his interview with the FBI, Cranmer initially denied telling Whitesides about the Kaman acquisition before it was announced, but later in the same interview he admitted that he had, in fact, illegally tipped Whitesides. Cranmer explained that there was no financial component to Cranmer providing the information to Whitesides to trade with, but Cranmer thought about how that would work. After Cranmer learned about the price range at what Kaman would be bought, he provided that pricing information to Whitesides, about a week before the deal closed. Regarding the FINRA inquiry, Cranmer admitted to the FBI that Whitesides told Cranmer to say that he did not know him. Cranmer said that was not realistic as they were clearly friends.

## Cranmer's Cooperation

A few days after Cranmer's FBI interview, Cranmer's counsel proactively reached out to the Government to express Cranmer's desire to meet with the Government and cooperate with the investigation. The Government insisted that any such meeting take place promptly. Cranmer and his counsel obliged, and the meeting was scheduled within the week.

Cranmer and his counsel traveled to New York to meet with representatives from the Government, the FBI, and the Securities Exchange Commission. During that meeting, Cranmer detailed (1) his knowledge of and involvement in Kaman's acquisition discussions, (2) his relationship with Whitesides, (3) his communications and in-person meetings with Whitesides

about the insider trading scheme, many of which the Government was not previously aware, and (4) his unsuccessful attempts to arrange for someone else to trade Kaman securities on his behalf, for which the Government did not otherwise have evidence.

### Procedural History

On May 12, 2025, Cranmer pleaded guilty to one count of securities fraud, pursuant to a cooperation agreement with the Government. On May 23, 2025, Whitesides and McCormick each pleaded guilty to one count of securities fraud. On September 29, 2025, the Court sentenced McCormick to two years of probation and ordered him to forfeit $115,596 and to pay a fine of $230,000. On October 3, 2025, the Court sentenced Whitesides to one year and one day of imprisonment and ordered him to forfeit $922,635.

### Section 5K1.1 Factors

Section 5K1.1 of the Guidelines sets forth five non-exclusive factors that sentencing courts are encouraged to consider in determining the appropriate sentencing reduction for a defendant who has rendered substantial assistance. *See* U.S.S.G. §5K1.1(a). The application of each of those factors to Cranmer's cooperation is set forth below.

1. **"[S]ignificance and usefulness of the defendant's assistance" (§5K1.1(a)(1))**

Cranmer's cooperation was both extremely significant and useful. Without Cranmer's cooperation, the Government's case against Whitesides would have been highly circumstantial, at best, and the Government likely would not have proceeded against McCormick at all. For example, Cranmer was able to provide the Government—and would have provided a jury if necessary—an inside look into the scheme, including direct evidence of (1) when and how he tipped Whitesides, which was otherwise unknown to the Government, (2) how and why McCormick was brought into the scheme, and (3) Whitesides's and McCormick's knowledge that the material nonpublic information was being disclosed in breach of a duty, which was otherwise inferential.

Cranmer's anticipated testimony about Whitesides's retelling of his in-person meeting with McCormick at Whitesides's home on January 10, 2024, was particularly important. According to Cranmer, it was at this meeting when Whitesides told McCormick that his information about the forthcoming Kaman acquisition came from someone inside Kaman, specifically someone he knew at Kaman who knew about the deal. This was critical willfulness evidence against both Whitesides and McCormick.

In short, the Government built a strong case against Whitesides and McCormick based in significant part on the usefulness of Cranmer's assistance.

2. **"[T]ruthfulness, completeness, and reliability" of the defendant's information and testimony (§5K1.1(a)(2))**

Cranmer was initially not truthful during the first part of his interview with the FBI, but he quickly pivoted during the very same interview and detailed for the FBI the complete truth of his

involvement and the involvement of others in the insider trading scheme. The Government has found Cranmer to be candid, remorseful, and credible. Notably, at his proffer session, Cranmer made no attempt to minimize his own involvement in the scheme, including his own criminal intent and willfulness, and even alerted the Governments to aspects of his crime, such as his attempts to have someone else trade Kaman securities on his behalf, for which the Government did not otherwise have evidence. Furthermore, the information Cranmer has provided has been complete, reliable, and corroborated by other evidence developed during the investigation, including phone records, text messages, and trading records.

### 3.   "[N]ature and extent of the defendant's assistance" (§5K1.1(a)(3))

The Government did not have occasion to call Cranmer as a witness in court or to use him proactively in a covert manner. Cranmer, however, did everything that the Government asked of him:  he met with the Government when asked and provided complete and truthful information about his and others' criminal activity.

### 4.   "[I]njury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance" (§5K1.1(a)(4))

The Government is not aware of any danger or risk of physical injury to Cranmer or his family resulting from his cooperation, but two consequences of Cranmer's cooperation are worth noting. First, Cranmer pleaded guilty and cooperated with the Government knowing that it would cost him his job at Kaman and inflict future professional reputational damage to the detriment of him and his family. Second, Cranmer cooperated against someone (Whitesides) whom he has known for more than a decade and against two people in his own religious community. Such cooperation often carries the risk of social ostracization. Nonetheless, Cranmer cooperated with full knowledge of the risks involved and never wavered.

### 5.   "[T]imeliness of the defendant's assistance" (§5K1.1(a)(5))

Cranmer's cooperation was very timely. Cranmer began cooperating during his very first interaction with the FBI and proffered with the Government days later. At the same time Cranmer was cooperating, his two co-defendants were continuing to deny any involvement in the insider trading scheme. As outlined above, Cranmer's cooperation was timely enough for the Government to use his information and the prospect of his testimony to secure pre-indictment guilty pleas from his two coconspirators. In short, Cranmer provided reliable, timely assistance from day one that was pivotal to the Government's case against his two coconspirators.

Hon. Margaret M. Garnett                                                          Page 6
January 2, 2026

### **Conclusion**

      In light of the facts set forth above, and assuming that the defendant continues to comply with the terms of his cooperation agreement, the Government intends to request at sentencing that the Court sentence the defendant in light of the factors set forth in Section 5K1.1 of the Guidelines.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:

    Adam S. Hobson
    Justin V. Rodriguez
    Assistant United States Attorneys
    Telephone: (212) 637-2591

cc:    Counsel of record (by ECF)